# FILED

DEC 2 1 2007

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SILICON IMAGE, INC., | No. C-07-00635 JCS |
| Plaintiff, | ~~REDACTED~~ |
| v. | **ORDER DENYING PLAINTIFF SILICON IMAGE, INC.'S MOTION FOR PRELIMINARY INJUNCTION [Docket Nos. 39 (public- redacted), 49 (sealed)]** |
| ANALOGIX SEMICONDUCTOR, INC., | |
| Defendant. | **~~(FILED UNDER SEAL)~~ PUBLIC VERSION** |

## I.    INTRODUCTION

Plaintiff Silicon Image, Inc. ("Silicon Image"), a leading provider of High Definition Multimedia Interface ("HDMI") semiconductor chips, filed this action against competitor Analogix Semiconductor ("Analogix"), asserting that Analogix has wrongfully misappropriated Silicon Image's trade secrets.  Silicon Image now brings a Motion for Preliminary Injunction (the "Motion"), seeking to enjoin Analogix from producing, selling, or offering for sale certain of its semiconductor chips that it alleges are illegal copies of Silicon Image's chips.  Silicon Image asserts that a preliminary injunction is necessary and appropriate because it will suffer immediate and irreparable injury if Analogix's actions are not enjoined and because it is likely to prevail on the merits in this action.  A hearing on the Motion was held on Friday, November 9, 2007, at 9:30 a.m.  Following the hearing, the parties filed supplemental briefs, the last of which was filed on December 3, 2007.  For the reasons stated below, the Motion is DENIED.

//

//

//

## II.     BACKGROUND

### A.     Facts

#### 1.     The Technology

Until recently, digital devices such as plasma TVs and DVD players exchanged information over analog cables, requiring that the signals be translated from digital to analog prior to transmission and then converted back into digital upon receipt. Declaration of Stephen Keating in Support of Plaintiff Silicon Image, Inc.'s Motion for Preliminary Injunction ("Keating Decl.") ¶ 3. Each translation of the signal resulted in deterioration of the signal, resulting in some distortion of video and audio quality. *Id.* ¶ 4.

In response to this problem, Silicon Image, along with other "prominent players in the consumer electronics and personal computing markets" developed a standard – called High Definition Media Interface, or HDMI, for transferring digital high definition video and audio between audiovisual devices such as HDTVs, HD DVD players, and digital set-top boxes. *Id.* ¶ 5. Using this technology, digital devices can communicate via HDMI cables rather than analog cables, using uncompressed HDMI signals rather than analog signals. *Id.* As a result, no analog translation is necessary, allowing for a sharper picture and clearer sound. *Id.* The HDMI cables also offer the advantage that a single cable can carry both video and audio signals, in contrast to analog cables, which require separate video and audio cables. *Id.* ¶ 6. In addition, HDMI cables transmit data at very high speeds, which allows for display and transmission of extremely high resolution video and audio data. *Id.* ¶ 7.

HDMI has now become an industry standard that is used by most consumer device manufacturers and is incorporated into "hundreds of millions of HDTVs and other consumer electronic products" including digital video cameras and recorders, Sony Playstation™ 3, and multimedia enabled cellular phones. *Id.* ¶ 8. In order to communicate over HDMI cables, these devices must include an HDMI interface, that is, a semiconductor chip that allows the device to transmit or receive HDMI video and audio signals. *Id.* ¶ 9. These chips contain small memory cells, called registers, which are used to store information for the rest of the device. *Id.* The registers can

1   be accessed through pins that are located on the outside of the chip.  *Id.*  There are two categories of

2   HDMI chips: HDMI transmitters and HDMI receivers.  *Id.* ¶ 10.

3       Silicon Image is a leading provider of HDMI transmitters and receivers, selling its HDMI

4   chips to manufacturers of consumer electronics that incorporate them into their digital audiovisual

5   products.  *Id.* ¶¶ 11-12.  Silicon Image's transmitters and receivers include hundreds of internal

6   registers that specify the operations of the chip and monitor the chip's performance.  *Id.* ¶ 13.  These

7   registers are used by software that controls the overall operation of the audiovisual device.  *Id.*  The

8   registers define the range of functions that can be controlled by the software, providing the key

9   interface for incorporating the HDMI chip into the device.  *Id.*  Each register has a name, a specific

10  function, a possible and default value, and an address assigned to it.  *Id.*

11      Two key aspects of the design of Silicon Image's HDMI chips are the arrangement of the

12  registers and the determination of the functionality to be exposed by the registers.  *Id.* ¶¶ 14-15.

13  Silicon Image's expert explains that:

14          Through the design process, including extensive collaboration with
        engineers of various expertises and from various groups within Silicon

15          Image, the selection of functions to be provided by the chips and to be
        enabled and controlled by the consumer product is identified, modified

16          and fine tuned.  Further, when customers request additional
        functionality or require a more flexible design, changes and additions

17          to the register set are made to accommodate such requests.

18  *Id.* ¶ 15.

19      The HDMI standard has gone through several iterations, from version 1.0 to the current

20  version 1.3.  *Id.* ¶ 17.  It is important that the successive generations of HDMI chips have "a

21  consistent well understood register set" because the registers define the software control interface

22  that customers use to design their products and it is easier for customers to incorporate new versions

23  of the HDMI chips when it is only necessary to incorporate the added features.  *Id.*

24      The specification of the collection of registers, including their functions, possible and default

25  values, and address locations, is called a register map.  *Id.* at ¶ 13.  Neither the register maps nor the

26  registers can be seen from the outside of the chip; nor can the functions, default values or addresses

27  of the registers be identified from the physical appearance of the chip.  *Id.*  Further, according to

28  Silicon Image's expert, because the chip designs for their receivers and transmitter chips are so

1  complex, it is "impossible or prohibitively expensive to reverse-engineer any of Silicon Image's

2  transmitters or receivers to discover the complete set of registers, their functions, layouts and

3  addresses." *Id.*

4      According to Silicon Image, it is the register sets and functions exposed by them that

5  distinguish their HDMI transmitters from those of the competition. *Id.* Therefore, they assert, the

6  register maps are confidential and proprietary to Silicon Image and are not described in any public

7  document. *Id.* The register maps are, however, described in Programmer Reference Guides that are

8  provided to Silicon Image's customers. *Id.* ¶ 18. According to Silicon Image, these Programmer

9  Reference Guides are provided to their customers only under "strict non-disclosure agreements." *Id.*

10  ¶ 18. Similarly, Silicon Image provides its customers, pursuant to non-disclosure agreements, source

11  code that enables the consumer devices to communicate with Silicon Image's transmitters and

12  receivers. *Id.* ¶ 19. This source code also includes the list of registers and addresses of Silicon

13  Image's HDMI chips. *Id.*

14

15  **2.  Measures Taken By Silicon Image to Protect the Confidentiality of its Alleged Trade Secrets**

16      According to Silicon Image, it expends "great effort to protect the secrecy of its trade secrets

17  and confidential proprietary information." Declaration of Solomon Langley in Support of Plaintiff

18  Silicon Image, Inc.'s Motion for Preliminary Injunction ("Langley Decl.") ¶ 3. Silicon Image's

19  Director of Global Satisfaction, Solomon Langley, describes the measures taken by Silicon Image as

20  follows:

21          Silicon Image requires its employees to sign confidentiality agreements
            restricting employees' disclosure of Silicon Image information. It
22          requires its customers and business partners to execute non-disclosure
            agreements and/or confidentiality agreements before any confidential
23          information is provided to them. Silicon Image's facilities are kept
            secure from unauthorized access through the use of a key card control
24          system, and all visitors must sign in at the front desk before they are
            permitted access. Silicon Image's computer system on which most of
25          its confidential information is stored is protected by network security
            and access control systems. Silicon Image also labels all confidential
26          proprietary documentation as such, and watermarks confidential
            information it discloses outside the company with the individual['s]
27          name receiving such confidential information. Each fiscal quarter,
            Silicon Image, through its legal department, also provides training

28

4

sessions to its employees detailing the measures necessary to protect the company's trade secrets.

*Id.*

With respect to the specific information at issue in this case, that is, the register maps and source code for Silicon Image's HDMI transmitters and receivers, Langley states that Silicon Image does not provide this confidential information to customers until it has performed due diligence to determine that the customer is not a competitor. *Id.* ¶ 4. Once this due diligence has been performed, the confidential information is provided pursuant to a non-disclosure agreement. *Id.* According to Langley, standard language in such a non-disclosure agreement is as follows:

> Recipient shall not disclose Confidential Information received from the Discloser under this NDA to any third party. The Recipient shall use the same degree of care in maintaining the confidentiality of the Confidential Information as it uses with respect its own information that is regarded confidential and/or proprietary by such party, but in any case shall at least use reasonable care. Recipient agrees that it will restrict access to all Confidential Information to carry out the Business Purpose for which the Confidential Information is provided, which persons will be bound to the Recipient by a written confidentiality agreement that contains substantially the same obligations as contained in this NDA.

*Id.* ¶ 5. The non-disclosure agreements in the record in this case indicate that Silicon Image generally specifies a particular period during which the confidentiality obligation set forth in the agreement is in force. *See* Declaration of Luann L. Simmons in Support of Analogix, Inc.'s Opposition to Plaintiff Silicon Image, Inc.'s Motion for Preliminary Injunction ("Simmons Decl.") Exs. 50-59. Most of these agreements also contain provisions requiring that the recipient return all confidential materials upon the request of Silicon Image. *Id.*

### 3. The HDMI Standard and the Market

According to Analogix CEO Kewei Yang, "Silicon Image was largely responsible for the formation and development of the HDMI Standard." Declaration of Kewei Yang in Support of Defendant Analogix Semiconductor, Inc's Opposition to Silicon Image, Inc.'s Motion for Preliminary Injunction ("Yang Decl.") ¶ 4. Specifically, in April 2002, Silicon Image joined with six other companies to create the HDMI standard and HDMI Licensing LLC ("HDMI Licensing"). *Id.* HDMI Licensing administers the licensing of the HDMI Standard. *Id.* Before a company can market

1  its semiconductor chips as being in compliance with the HDMI standard, it must sign an HDMI

2  Specification Adopter Agreement. *Id.* Those companies who are signatories must also submit their

3  products for certification to an Authorized Test Center ("ATC"). According to Yang, there are eight

4  ATCs in the world, five of which are operated by Silicon Image. *Id.* ¶ 8. Silicon Image operates the

5  only ATC in North America, located in Sunnyvale California ("the Sunnyvale ATC"). *Id.* ¶¶ 8-9.

6        Analogix has signed the HDMI Adopter Agreement and has submitted chips to the Sunnyvale

7  ATC. *Id.* ¶ 9. In particular, on April 26, 2006, Analogix submitted an application for testing of its

8  ANX9021-EV, which was ultimately certified. *Id.* On May 18, 2007, Analogix submitted a chip

9  incorporating the HDMI 1.3 standard to the Sunnyvale ATC. *Id.* As of September 20, 2007, that

10  chip had not been certified by the Sunnyvale ATC and Analogix had submitted the chip to an ATC

11  in China. *Id.* ¶ 10.

12        **4.**    **Analogix and its HDMI Chips**

13        Analogix was founded in 2002. *Id.* ¶ 2. The company designs and sells semiconductor chips,

14  including HDMI chips. *Id.* Analogix began selling semiconductor chips in February 2006 and

15  currently, 2/3 of its revenues come from HDMI chip sales. *Id.* Currently, Analogix has about 90

16  employees and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* According to Yang, Analogix is

17  currently selling the following four chips that comply with the previous version of the HDMI

18  Standard, HDMI 1.2: 1) ANX9011, a single-channel HDMI Receiver; 2) ANX9021, a dual-channel

19  HDMI Receiver; 3) ANX9025, a dual-channel HDMI Receiver; and 4) ANX9030, an HDMI

20  Transmitter. *Id.* ¶ 3. In addition, Analogix is testing six dual-part receiver chips designed to comply

21  with HDMI 1.3, the standard that was announced in June 2006: 1) ANX8750; 2) ANX8755; 3)

22  ANX8770; 4) ANX8760; 5) ANX8765; and 6) ANX7760. *Id.*

23        The datasheets for the ANX9011, ANX 9021, ANX9025, and ANX9030 state that these

24  chips are "pin-out compatible" with specifically identified Silicon Image chips. *See* Griffin Decl.

25  Ex. B (ANX 9011 datasheet stating that it is "[p]inout compatible with Silicon Image SiI9011");

26  Ex. C (ANX9021 datasheet stating that it is "[p]inout compatible with Silicon Image

27  SiI9021/9031"); Ex. D (ANX9030 datasheet stating that it is "pin-compatible with the SiI9030 yet

28

United States District Court

For the Northern District of California

1 offers additional features and functionality and lower power option"); Ex. I (ANX9025 datasheet

2 stating that it is "[p]inout compatible with Silicon Image SiI9025"); *see also id.*, Ex. G (Analogix

3 document entitled "ANX9021and SiI9023 receiver pin out comparison" describing the "minor

4 modifications" required to replace the SiI9023 with the ANX9021); Ex. J (comparison of ANX9011

5 datasheet with Programmer's Reference Guide for SiI9011 showing that the chips have nearly

6 identical register maps); Ex. L (comparison of ANX9030 datasheet with Programmer's Reference

7 Guide for SiI9030 showing that the chips have nearly identical register maps).

8      Similarly, the datasheet for the ANX8750 and ANX8755 state that these chips "can be used

9 in circuit boards designed for the ANX9021 or SiI9023/25." *Id.* Ex. M. Silicon Image's expert, Roy

10 Griffin, also compares excerpts from the ANX8750, ANX8755, ANX8770, and ANX8775

11 datasheets to the Programmers Reference Guide for the SiI9135 (a version 1.3 HDMI chip) and

12 concludes that these Analogix chips "mimic" registers found in the Silicon Image chips. Griffin

13 Decl. ¶ 25 & Ex. O. According to Griffin, while the copying of these chips is not so "blatant and

14 obvious" as with the drip-in-replaceable chips, "one can deduce that the ANX8750, ANX8755,

15 ANX8770 and ANX9775 are at least derivative in part of [Silicon Image] chips because they

16 propagate embodiments of residual SI design decisions . . . ."

17      The datasheets for the ANX7760, ANX8760, and ANX8765 are not in the record before the

18 Court. Silicon Image's expert, Roy Griffin, states in his Reply declaration that he was not provided

19 with the register maps for these chips and was advised by counsel that Analogix did not provide

20 these register maps prior to the date of his original declaration, and had not provided Silicon Image

21 with the register map for the ANX7760 at the time of his Reply declaration. Declaration of Roy A.

22 Griffin in Support of Plaintiff Silicon Image, Inc.'s Motion for Preliminary Injunction ("Griffin

23 Reply Decl.").

24     **B.**    **Events Leading Up to this Action and Procedural Background**

25      In April, 2006, Analogix began advertising the two chips named in Silicon Image's original

26 Complaint, the ANX9011 Single Channel Receiver ("the ANX9011") and the ANX9021 Dual

27 Channel Receiver ("the ANX9021"). *See* Simmons Decl., Exs. 66-67. Analogix marketed the

28 ANX9011 as "[p]inout compatible with Silicon Image SiI9011. *Id.* Ex. 66 (ANX9011 Product

7

1  Brief). It marketed the ANX9021 as "[f]ootprint compatible with Silicon Image SiI9021/9031." *Id.*
2  Ex. 67 (ANX9021 Product Brief).

3      By early May 2006, Silicon Image was aware that Analogix was selling microchips that it
4  marketed as being "drop-in-replaceable" with its own. *See* Simmons Decl., Ex. 14 at SG 22075
5  (presentation notes entitled "PanelLink SiI9025 and SiI9035 PAS," dated May 12, 2006, referring to
6  Analogix as "drop-in replacement customers" under heading "Competition"). In November 2006,
7  Silicon Image Vice President Eric Almgren sent a letter to Analogix CEO Kewei Yang notifying
8  Analogix that it believed Analogix had improperly copied Silicon Image's layout and chip designs to
9  develop the ANX9011 and ANX9021 chips.[1]

10     Analogix responded in a letter dated December 6, 2006, stating that Analogix was "not aware
11  of any improper conduct committed in the course of developing its products, including any improper
12  conduct involving the use or disclosure of Silicon Image's trade secrets or proprietary information
13  . . ." Reply Declaration of Saina S. Shamilov in Support of Plaintiff Silicon Image, Inc.'s Motion for
14  Preliminary Injunction ("Shamilov Reply Decl.") Ex. O (December 6, 2006 letter). The letter further
15  stated that Analogix "takes appropriate steps" to prevent misappropriation, including "advising
16  employees and applicants that they should not divulge, or encourage others to divulge, trade secrets
17  or proprietary information of third parties." *Id.*

18     On January 31, 2007, Silicon Image filed this action. Analogix filed a motion to dismiss
19  under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which the Court granted in part and
20  denied in part. Silicon Image filed its First Amended Complaint on May 30, 2007. Silicon Image
21  asserts four claims in the First Amended Complaint: 1) Copyright Infringement in violation of the
22  Copyright Act (17 §§ U.S.C. 101 *et seq.* ); 2) Trade Secret Misappropriation in violation of
23  California's Uniform Trade Secrets Act (California Civil Code §§ 3426 *et seq.*); 3) Intentional

24
25

---

26     [1] Although the letter is undated, Silicon Image does not dispute Analogix's representation that
   the letter was sent in November 2006. *See* Simmons Decl. ¶ 70. In its Reply, Silicon Image asserts that
27  since May 2006, it has been "diligently investigating" the "extent of Analogix's unlawful copying."
   Reply at 12. Silicon Image does not, however, cite any evidence documenting these efforts in the
28  months preceding it letter to Analogix in November 2006.

1    Interference with Contractual Relations; and 4) Unfair Competition in violation of California's

2    Business and Professions Code §§ 17200 *et seq.*

3        On June 20, 2007, Analogix produced to Silicon Image over 4,000 pages of documents,

4    including the datasheets for its HDMI chips. Six weeks later, Silicon Image filed the instant motion

5    seeking a preliminary injunction.

6    **C.**     **The Motion**

7        Silicon Image argues that a preliminary injunction should be entered in this case because

8    there is a high probability of success on the merits with respect to its claim for misappropriation of

9    trade secrets and there is a possibility of irreparable harm to Silicon Image if Analogix is permitted

10    to continue selling the chips that Silicon Image asserts incorporate its trade secrets. Motion at 16-17.

11    With respect to likelihood of success, Silicon Image points to evidence that it argues strongly

12    supports all of the elements of the claim for trade secret misappropriation under California law,

13    namely, the existence of trade secrets, improper appropriation, use or disclosure of the trade secrets,

14    and resultant loss or unjust enrichment. *Id.* at 17-20. According to Silicon Image, its register maps

15    and source codes are trade secrets because they derive economic value from not being generally

16    known and because Silicon Image has made reasonable efforts to protect their confidentiality. *Id.*

17    The evidence of copying by Analogix, Silicon Image asserts, satisfies the improper use element of

18    the claim. *Id.*

19        As to the resultant loss, Silicon Image points to evidence that it has been – and continues to

20    be – harmed by the sale of Analogix's HDMI chips. *Id.* at 20-23. ████████████

21    ████████████████████████████████████████

22    ████████████████████████████████████

23    ████████████████████████████████████

24    ████████████████████████████████████████

25    ███████████████████████████████████

26    ████████████████████████████████████████

27    ████████████████████████████████████████

28

1 ████████████████████████████████████████████████

2 ██████████████████████████████████████████ *Id.* ¶ 5.

3       These losses cannot be compensated by money damages, Silicon Image argues, for several

4 reasons. First, the low prices offered by Analogix have led to a loss of goodwill in the marketplace,

5 the extent of which is likely to be difficult to measure. Second, Analogix's low prices have led to

6 price erosion, which impacts not only the chips that are currently available but also future

7 generations of chips. Third, Silicon Image will be unable to control the further proliferation of the

8 datasheets and Programmer Reference Guides already in Analogix's possession, which may result in

9 copies of Silicon Image's datasheets and programmer reference guides being provided to other

10 competitors absent an injunction. Finally, Silicon Image asserts that ████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ███████████████ Reply at 12 (citing Shamilov Reply Decl. Ex. J (Kang Depo.) at 141-42).

14       **D.     The Opposition**

15       Analogix argues that Silicon Image has not demonstrated a high probability of success on the

16 merits or a possibility of irreparable harm and, therefore, a preliminary injunction should not be

17 entered. With respect to the likelihood of success on the merits, Analogix asserts that Silicon Image

18 has offered no evidence of misappropriation as to the ANX9025, ANX7760, ANX8760, and

19 ANX8765 and only "limited, speculative evidence" of misappropriation as to the ANX8750,

20 ANX8755, and ANX8770. In connection with this assertion, Analogix cites to Roy Griffin's

21 testimony that pin compatibility does not mean the registers of a chip are the same. Opposition at 9

22 (citing Simmons Decl. Ex. 21 (Griffin Depo.) at 59-61).

23       Analogix further argues that Silicon Image is not likely to prevail on the merits because the

24 register maps that Silicon Image asserts are trade secrets are not, in fact, trade secrets for a variety of

25 reasons. First, Analogix asserts that Silicon Image's register maps are "readily available on the

26 Internet and elsewhere" and Silicon Image "makes no effort to monitor the widespread disclosure of

27 its register maps." Opposition at 11. In support of this assertion, Analogix cites to Analogix CEO

28 Yang's declaration stating that source code for the SiI9021 chip was uploaded to a website with the

1  url www.programsalon.com on June 15, 2006. Yang Decl. ¶ 15 & Ex. B. The same website also

2  published source code for Silicon Image's HDMI version 1.3 receiver chip. *Id.* Ex. C. According to

3  Yang, this information was uploaded to the website on December 23, 2006.

4       Analogix's expert, Stephen Melvin, further describes documents that he retrieved from

5  www.programsalon.com by paying $200 to become a "VIP member." *See* Declaration of Dr.

6  Stephen W. Melvin in Support of Defendant Analogix Semiconductor, Inc.'s Opposition to Silicon

7  Image, Inc.'s Motion for Preliminary Injunction ("Melvin Decl.") ¶ 18. According to Melvin, the

8  "vast majority of the register map information" that Silicon Image contends is confidential was

9  available in these documents. *Id.* ¶¶ 19-20.

10       Analogix also cites to deposition testimony by Silicon Image representative Solomon Langley

11  stating that he had located on the Internet datasheets of other HDMI manufacturers. ██████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ██████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████████

18  ██████████████████████████████████████████████████

19  ████████████████ Opposition at 12 (citing Simmons Decl. Ex. 22 (Langley Depo.) at 124).

20       In fact, Analogix asserts, "[t]he availability of Silicon Image's and other company's [sic]

21  register information on the Internet is part of a widespread, accepted practice in the HDMI industry

22  that companies access each others 'confidential' information without penalty." Opposition at 13.

23  According to Analogix, the fact that Silicon Image has accessed its competitor's datasheets –

24  including those of Analogix (marked proprietary and confidential) – is evidence of Silicon Image's

25  acceptance of this practice. *Id.* Analogix also points to the "sheer number of sources that have

26  disclosed Silicon Image's documents marked 'proprietary' and 'confidential.'" *Id.* (citing Simmons

27  Decl. Exs. 30-48).

28

1    Analogix also points to documents produced by Silicon Image that reflect that Silicon Image

2    was aware that other companies were marketing chips that were pin compatible or drop-in-

3    replaceable with their own. Opposition at 14 (citing Simmons Decl. Exs. 14 at SG 22075, 15 at SG

4    21653, 16 at SG 22031 & 20 at SG 21981). According to Analogix, the fact that Silicon Image has

5    not taken measures to prevent these companies from marketing their chips is evidence that it

6    participates in an industry-wide practice in which product information that is purportedly

7    confidential is freely exchanged. *Id.*

8        In support of the assertion that Silicon Image does not treat the register maps as confidential,

9    Analogix also points to the duration limitations contained in the NDA's that customers must sign to

10   obtain confidential information. Opposition at 14. According to Silicon Image, many of these

11   NDAs protect the confidentiality of the information disclosed under them for a period of only two or

12   three years after disclosure, and many have expired. *Id.* As a result, Analogix asserts, much of the

13   information disclosed under the NDAs has become part of the public domain. *Id.*



25                    Opposition at 15 (citing Simmons Decl. Ex. 49 (Silicon Image interrogatory

26   responses)).

27       Next, Analogix points to some specific examples that it asserts show that Silicon Image does

28   not follow its own security procedures. First, it points to several datasheets produced in discovery

with a Silicon Image watermark ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Simmons Decl. Exs. 34, 41 & 42. According

to Analogix, Silicon Image had no agreement with such an entity limiting confidentiality.

Opposition at 17.[2] Second, Analogix states that it has located a Silicon Image SiI9021/9031

Programmer's Reference Guide which is not marked confidential but instead is marked "This is an

uncontrolled copy once printed from SiI Intranet." Opposition at 17 (citing Simmons Decl. Ex. 60).

Third, Analogix points to several Silicon Image datasheets, apparently produced in discovery, that

carry no "confidential" designation on them. *Id.* (citing Simmons Decl. Exs. 61, 62, 63, 64 & 65).

     Analogix also asserts that Silicon Image should not be granted injunctive relief because there

is no evidence of irreparable harm. *Id.* at 17. Analogix argues that the Cary Declaration, which

addresses the impact of Analogix conduct on Silicon Image's customers and sales, should not be

considered because Cary has relied on the reports of his sales staff, rendering the testimony

inadmissible hearsay. *Id.* According to Analogix, injunctive relief also is not warranted because

whatever harm Silicon Image may suffer, it is not "immediate." *Id.* at 19. In support of this

contention, Analogix points to what it asserts were delays on the part of Silicon Image in contacting

Analogix, filing suit and bringing the preliminary injunction motion. Analogix also points to Silicon

Image's "failure to pursue other competitors," asserting this inaction "belies its claim of an

immediate, irreparable injury." *Id.* at 21. Moreover, Analogix argues, any harm suffered by Silicon

Image may be remedied by damages because it is purely economic.

     Finally, Analogix asserts that the balance of the hardships tips sharply in its favor because it

is a small, start-up company and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 23 (citing Yang Decl. ¶ 17). In contrast, Silicon Image is a "market

leader that continues to experience record growth year after year." *Id.* at 24. Moreover, Analogix

---

    [2] Analogix cites generally to Silicon Image's interrogatory responses. *See* Simmons Decl. Ex.
49. Apparently, this is a reference to Silicon Image's response to Interrogatory No. 10, which asks for
a list of individuals who have been provided access to Silicon Image trade secrets under non-disclosure
agreements. Because the response provided by Silicon Image merely identifies a series of documents,
by Bates stamp range, produced in discovery, it is impossible for the Court to determine from the
interrogatory response whether or not Silicon Image had entered into a non-disclosure agreement ▮▮▮▮

United States District Court
For the Northern District of California

1 argues, Silicon Image has been engaging in "anti-competitive conduct" and creating an "improper

2 monopoly" and entry of a preliminary injunction would make the Court an "accessory" to this

3 inequitable conduct. *Id.* at 25.

4     **E.**    **The Reply**

5     In its Reply, Silicon Image presents new evidence – not yet obtained at the time it filed the

6 Motion – that Analogix copied Silicon Image's register maps to develop its own HDMI chips. This

7 evidence shows that Analogix went to great lengths to obtain Silicon Image datasheets and

8 programmer reference guides, including offering employees "bounty" payments of up to $10,000 for

9 particular datasheets and programmer guides. In reliance on this evidence, as well as the evidence

10 cited in the Motion, Silicon Image asserts that entry of a preliminary injunction is justified under the

11 circumstances.

12     Having provided circumstantial evidence of copying in the Motion, such as use of the same

13 part numbers and nearly identical internal register maps, Silicon Image in its Reply points to direct

14 evidence of copying: Analogix's corporate designee, Craig Wiley, testified in deposition that

15 Analogix copied Silicon Image's register designs with respect to many of its chips. *See* Shamilov

16 Reply Decl. Ex. B (Wiley Depo.) at 21-22 (Analogix copied SiI9030, 9125, 9134); 46-50 (Analogix

17 copied registers from SiI9011 to create ANX9011); 85 (80% of ANX9021 are copied from SiI9021);

18 86 (ANX9026 is based on ANX9021 and uses some of the same registers that were copied from

19 SiI9021); 89-90 (ANX 8760 and 8765 contain some of the registers that were copied from the

20 SiI9021); 91 (ANX8650 is register compatible with SiI9025); 182 (ANX 7150 contains some of the

21 same register sets as SiI9030); 186 (ANX 8560 is former ANX 9134, which copied silicon Image

22 chip). Similarly, e-mails between marketing and engineering personnel at Analogix make frequent

23 reference to Analogix's use of Silicon Image's chip designs. *See* Shamilov Reply Decl. Exs. T, U,

24 V, W & X. And Analogix CEO Yang testified that Analogix used Silicon Image's datasheets and

25 registers "as a reference to design [its] chips to be register compatible with Silicon Image 9021 and

26 9011 chips." Shamilov Decl. Ex. J (Yang Depo.) at 161.

27     Silicon Image also presents evidence in support of its Reply showing that Analogix has gone

28 to great lengths to obtain Silicon Image's datasheets and programmer reference guides. For example,

1   in an e-mail between Analogix executives dated August 16, 2006, an Analogix executive stated as

2   follows:

3
4   
5

6   Shamilov Reply Decl. Ex. F.   On September 15, 2006, Analogix executive Akyra Pagoulatos sent

7   the following e-mail to CEO Yang:

8
9   
10

11  Shamilov Reply Decl. Ex. A.   On the same day, an e-mail of congratulations was sent to the

12  Analogix employee

13

14

15

16

17  

18

19

20

21

22

23

24  *Id.* Ex. I.

25          Silicon Image rejects Analogix's assertion that there is an industry practice of "freely

26  exchanging" confidential register map information.  I t points to testimony by Analogix corporate

27  designee Craig Wiley that Analogix itself designates its register specifications as confidential in

28  order to prevent competitors from copying their designs.  *Id.* Ex. B (Wiley Depo.) at 25, 234.  It also

1  notes that Analogix register descriptions that were produced in this litigation were designated as

2  "Highly Confidential – Attorneys' Eyes Only." *Id.* Ex. K. Further, Silicon Image argues that the

3  large bonuses that were paid for Silicon Image datasheets belies Analogix's assertion that there is a

4  practice of "freely exchanging" such information.

5  Next, Silicon Image argues that the posting of some source code on the Internet website

6  programsalon.com is not a defense to Silicon Image's claim of trade secret misappropriation. Reply

7  at 6-9. First, Silicon Image asserts that the website on which the information was posted is "an

8  obscure Chinese-language website" and points to CEO Yang's deposition testimony that neither he

9  nor anyone else at Analogix was aware of the website until May 2007, despite the great efforts it was

10  making to track down Silicon Image register specifications. Reply at 6-7 (citing Shamilov Decl. Ex.

11  J (Yang Depo.) at 179. In fact, according to Silicon Image, only "a handful of registered users

12  including Analogix's expert Dr. Melvin" actual downloaded the Silicon Image information. Reply at

13  7 (citing Melvin Decl. Ex. B).

14  Second, Silicon Image's expert challenges the opinion of Analogix's expert that the source

15  code that was published on programsalon.com contained "most of the register map information for

16  an HDMI-enabled chip since it contains the commands to read from and write to registers directly on

17  the chip." Reply Declaration of Roy A. Griffin in Support of Plaintiff Silicon Image, Inc.'s Motion

18  for Preliminary Injunction ("Griffin Reply Decl.") ¶ 5 (quoting Melvin Decl. ¶ 12). Rather, Dr.

19  Griffin takes the position that the programmer reference guides are necessary to "unambiguously

20  determine the locations of registers, the location of bits in registers, and the function and operation of

21  registers and bits." *Id.* ¶ 6. Dr. Melvin admitted in his deposition, however, that he was unable to

22  find this programmer reference documentation on the Internet despite efforts to locate that material.

23  Shamilov Reply Decl. Ex. M (Melvin Depo.) at 19-20.

24  Third, Silicon Image asserts that whatever information was posted on programsalon.com is

25  irrelevant to its misappropriation claims because the alleged misappropriation occurred long before

26  this material was posted on-line. Reply at 8-9.

27  Silicon Image also argues that it has taken all reasonable measures to protect its confidential

28  materials and that it is not required to engage in unduly burdensome efforts to police the Internet for

16

1   what amounts to industrial espionage.  Reply at 9.  ███████████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   ████████████████████████████  *See* Reply at 9 n.7 (citing Shamilov Decl. Ex. P).

5   Silicon Image further contests Analogix's assertion that upon expiration of the NDAs, documents

6   provided under them become part of the public domain.  Rather, Silicon Image asserts, those

7   documents must be destroyed or returned to Silicon Image.  Reply at 9 (citing Simmons Decl. Exs.

8   50-59).

9       With respect to irreparable harm, Silicon Image reiterates that Analogix's theft of its trade

10  secrets has resulted in loss of goodwill, which constitutes irreparable harm.  Reply at 10-12. ██████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████

13  ████████████  *Id*. (citing Shamilov Reply Decl. Ex. Q (Cary Depo.) at 101-03, 113).

14  ██████████████████████████████████████████████████████████████████

15  ██████████████████████████████  *Id*. at 11 (citing Shamilov Reply Decl. Ex. R).  The

16  danger of further such disclosures is increased, according to Silicon Image, because Analogix's

17  CEO, Kewei Yang, indicated in his deposition that he does not now consider Analogix product

18  information – which contains Silicon Image's register information – confidential.  *Id*. (citing

19  Shamilov Reply Decl. Ex. J (Yang Depo.) at 197).

20      Another ground for finding irreparable harm, Silicon Image asserts, is that ███████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████  *Id*. at 12 (citing Shamilov Reply

23  Decl. Ex. J at 141-42).

24      Silicon Image argues that it did not unreasonably delay in seeking a preliminary injunction.

25  *Id*. at 12.  It argues that between the time it learned of Analogix's chips, in May 2006, and its letter to

26  Analogix, in November, Silicon Image was investigating whether Analogix could have reverse-

27  engineered the chip.  *Id*.  Only a few weeks after Analogix denied copying Silicon Image's trade

28  secrets, Silicon Image initiated this action.  *Id*.  According to Silicon Image, it was not until Analogix

17

1  provided its datasheets on June 20, 2007 – along with 4,000 pages of documents – that Silicon
2  Image became aware of the extent of the copying.  *Id.*  In light of the large volume of documents
3  Silicon Image had to review, it asserts that filing the preliminary injunction motion on August 2,
4  2007, did not amount to an unreasonable delay.  *Id.*

5          In response to Analogix's argument that a preliminary injunction should be denied ████████
6  ██████████████████████████████████ thus tipping the balance of hardships in favor of
7  Analogix, Silicon Image makes two arguments.  *Id.* at 13.  First, it argues that courts are required to
8  consider the balance of the hardships only where there are only "serious questions" as to the merits
9  of the plaintiff's claim (rather than a high probability of success) and that is not the case here.  *Id.*
10  Second, even if the Court considers the balance of the hardships, Silicon Image asserts, it should not
11  factor in the possibility that Analogix might be put out of business by a preliminary injunction
12  because that will be the result of Analogix's own choice to build a business based on copying Silicon
13  Image's trade secrets, not the entry of the preliminary injunction.  *Id.*

14          Finally, Silicon Image rejects Analogix assertion that a preliminary injunction would only
15  assist Silicon Image in maintaining an improper monopoly.  *Id.* at 13-14.  According to Silicon
16  Image, this argument fails because even if true, the alleged anti-competitive conduct is not directly
17  connected to the alleged theft by Analogix of Silicon Image's trade secrets.  *Id.*

18      **F.    The Surreply**

19          Prior to the November 9, 2007 hearing, Analogix filed a Surreply, drawing the Court's
20  attention to documents – produced by Silicon Image after Silicon Image filed its Reply – indicating
21  that Silicon Image itself had a "Bounty Program" for obtaining the confidential datasheets of third
22  parties.  *See* Declaration of Ryan J. Padden in Support of Analogix's Surreply ("Padden Decl.") Ex.
23  E ("Silicon Image Sales Bounty Rules" for 2007). ████████████████████████████████████
24  ████████████████████████████████████████████████████████████████████████████
25  ████████████████████████████████████████████████████████████████████████████
26  ██████████████████████████████████████████████████████████████████████████
27  ████████████████████████████████████████████████████████████████████████████
28

United States District Court
For the Northern District of California



Finally,

— almost a

year before Silicon said it first obtained these datasheets through discovery in this action. The delay

of over a year before seeking a preliminary injunction, Analogix argues, is inconsistent with a

finding of irreparable harm.

### G.    The Hearing

At the hearing, Silicon Image was asked to explain how it came into possession of the

apparently confidential third-party documents that were filed in support of Analogix's surreply.

Silicon Image's counsel was unable to provide a definitive answer to this question but suggested that

the vast majority of the documents were likely produced under NDAs. Silicon Image's counsel also

asserted that none of the documents contained detailed register information and many were likely

available on the Internet. The Court instructed Silicon Image to investigate the circumstances under

which Silicon Image obtained the documents and to file a supplemental brief on this question. It

further requested a declaration listing all of the chips at issue in the case, along with the evidence of

copying by Analogix and the dates on which the copying was alleged to have occurred.

1    On the question of delay, Silicon Image conceded that it had detailed register maps of

2    Analogix's 1.2 version chips by the summer of 2006, but stated that it did not have detailed register

3    information as to Analogix's 1.3 version products until they were produced in the course of

4    discovery in this case, in June 2007.  Silicon Image's counsel explained that in the summer of 2006,

5    it would not have made sense to move for a preliminary injunction as to the 1.2 version chips

6    ███████████████████████████████████████

7    **H.    Post-Hearing Supplemental Briefs**

8        Following the hearing, Silicon Image filed a supplemental brief.  Silicon Image began the

9    brief by stating that "[w]hile the Court has ample grounds to enjoin the full Analogix product line, at

10   a minimum, the Court should enjoin Analogix from introducing its new HDMI 1.3 products in the

11   market."  Silicon Image also endorsed the idea of an early trial, possibly in April 2008, suggested by

12   the Court at the hearing.  Silicon Image then went on to address the significance of the documents

13   filed in support of the surreply.

14       With respect to the 43 Third-Party Documents, Silicon Image provided a declaration

15   documenting the results of an investigation by Silicon Image employee Sal Cobar. ███████████

16   ████████████████████████████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   ██████████████████████████

23   ██████████████████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████████

26   ████████████████████████████████████████

27   ████████████████████████████████████████

28   ████████████████████████████████████████

20

1 ████████████████████████████████████████████

2 ██████████████████████████████████████████

3 ████████████████ *See* Declaration of David D. Schumann in Support of Plaintiff Silicon

4 Image, Inc.'s Motion for Preliminary Injunction ("Schumann Decl.") Ex. 15.

5      Silicon Image concedes that it was unable to determine where it obtained 12 of the Third-

6 Party Documents.

7 ████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████

13 ██████ *Id.* Suh also states in her declaration that the non-disclosure agreements covering the

14 technology in this case have a duration of between two and four years, and that companies in Silicon

15 Valley will not sign a non-disclosure agreement that imposes perpetual confidentiality obligations.

16 *Id.* ¶ 8.

17      Finally, Silicon Image provided a chart setting forth each of the Analogix chips that are

18 alleged to have been copied, the evidence of copying and the date the copying is alleged to have

19 occurred. *See* Schumann Decl. Ex. 1.

20      In its response to Silicon Image's supplemental brief, Analogix points out that according to

21 Silicon Image's own account, some the Third-Party Documents were obtained from Silicon Image's

22 customers and distributors as early as November 2004. *See* Cobar Decl. Attach. A, Entry No. 22.

23 Thus, Analogix asserts, Silicon Image cannot argue that at the time the alleged copying was

24 occurring, in 2005 and 2006, it did not know that NDAs were not being respected by its own

25 customers and distributors. Nor has Silicon Image presented any evidence, Analogix argues, that

26 these customers or distributors were authorized to provide the Third-Party Documents to Silicon

27 Image, even if the customers and distributors themselves had NDAs with Silicon Image.

28

Analogix challenges Silicon Image's assertion that it obtained some of the Third-Party Documents from company websites, █████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████

Analogix argues that Silicon Image, having engaged in conduct that is the same as that which Analogix is alleged to have engaged in, is guilty of unclean hands and should not be afforded injunctive relief. In addition, Analogix asserts once again that Silicon Image has acted unreasonably in providing confidential information to customers and distributors who have revealed, through their own conduct, that they are unlikely to respect the confidentiality of Silicon Image's documents or their obligations under their NDAs with Silicon Image. Further, Analogix asserts, ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

Finally, Analogix questions the dates provided by Silicon Image regarding when the trade secrets that were allegedly copied were created. *See* Almelming Decl. Ex. A. In particular, Analogix asserts that Silicon Image has provided the dates on which many of the documents were last updated even though the documents were actually created – and disclosed to third parties – much earlier. Further, Analogix emphasizes that as to the 1.3 version chips, the allegation of copying is based on

1    the alleged copying of register information from *earlier* version ships whose register designs were

2    incorporated into the most recent version.  Thus, the relevant trade secrets come from programmer

3    reference guides and datasheets that were created in 2002 and 2003.  *See* Almelming Decl. Ex. A at

4    4.  Given that several years has now passed and the short duration of the NDAs, this confidential

5    information is no longer entitled to trade secret protection (assuming it ever was), Analogix argues.

6    **III.    ANALYSIS**

7         **A.    Legal Standard**

8              In the Ninth Circuit, a plaintiff can meet its burden for a preliminary injunction by showing

9    "either (1) a combination of probable success on the merits and the possibility of irreparable injury,

10   or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the

11   moving party." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 839-40

12   (9th Cir. 2001).  These standards are not separate tests but rather, represent the "outer reaches of a

13   single continuum." *Id.* (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A.,* 4 F.3d 819, 822 (9th Cir.

14   1993)).

15        **B.    Likelihood of Success on the Trade Secret Misappropriation Claim**

16             In order to prevail on its trade secret misappropriate claim, Silicon Image must demonstrate

17   both that the information at issue was misappropriated *and* that the copied information is entitled to

18   protection as a trade secret.  Silicon Image asserts its claim for trade secret misappropriation under

19   California's Uniform Trade Secrets Act ("UTSA"), Cal. Civ. Code § 3426-3426.11.  Under the

20   UTSA, information is a trade secret if it "1) [d]erives independent economic value . . . from not

21   being generally known to the public or to other persons who can obtain economic value from its

22   disclosure and use; and 2) [i]s the subject of efforts that are reasonable under the circumstances to

23   maintain its secrecy." Cal. Civ. Code § 3426.(1)(d).  Coversely, an "unprotected disclosure of the

24   holder's secret terminates the existence of the trade secret." *Stutz Motorcar of America, Inc. v.*

25   *Reebok Int'l Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) (citing *Vacco Indus., Inc. v. Van Den*

26   *Berg*, 5 Cal. App. 4th 34, 50 (1992).  Misappropriation includes "[d]isclosure or use of a trade secret

27   of another without express or implied consent" by a person who knew or had reason to know the

28   information was obtained through improper means.  Cal. Civ. Code § 3426.

23

### 1. Misappropriation

Silicon Image has provided both direct and circumstantial evidence that Analogix has copied its HDMI chips. Analogix, however, questions the sufficiency of the evidence with respect to seven of the chips listed in Silicon Image's proposed order: 1) ANX9025; 2), ANX7760; 3) ANX8760 4) ANX8765; 5) ANX8750; 6) ANX8755; and 7) ANX8770. The Court addresses the evidence of copying as to each of these chips.

ANX9025: Silicon Image's expert stated in his original declaration that he had compared the ANX9025 to the SiI9125/35 and found "many of the same register and bit arrangements as the SiI9125/35." Griffin Decl. ¶ 26. On that basis, Griffin concluded that the ANX9025 was copied, at least in part, from Silicon Image's chip. *Id.* Deposition testimony by Craig Wiley confirms that approximately 80% of the registers in the ANX 9025 are identical to the registers in the SiI9025. Shamilov Reply Decl. Ex. B (Wiley Depo.) at 95. In the context of the direct evidence that Analogix's entire business approach is based on copying Silicon Image chips, the evidence that the ANX chip is almost identical to Silicon Image's chip provides strong support for the conclusion that the ANX9025 was copied.

ANX7760: In his Reply Declaration, Griffin explains that he has not provided any evidence of misappropriation with respect to the ANX7760 because the register maps have not yet been provided to Silicon Image by Analogix for this chip. Griffin Reply Decl. ¶ 19. In its Reply, Silicon Image asserts that Wiley admitted that Analogix copied Silicon Image's designs in every one of its chips, including the ANX7760. *See* Reply at 3. However, Wiley does not directly address the ANX7760 in the cited testimony. *See* Shamilov Reply Decl. Ex. B (Wiley Depo.). Nor does the Court find any statement in the deposition excerpts provided that states broadly that Analogix copied Silicon Image's registers in *all* of its HDMI chips. Therefore, the Court does not find a high probability of success as to this particular chip.

ANX8760 and ANX8765: Griffin also did not address these chips in his original declaration because at that time, Analogix had not provided the datasheets for these chip. Griffin Reply Decl. ¶ 19. Although Analogix apparently has now produced those datasheets, Griffin has not been provided with the datasheets or asked to provide an opinion as to misappropriation. *Id.* Griffin

United States District Court

For the Northern District of California

1    notes, however, that Wiley admitted in his deposition that many of the registers of the ANX8760 and

2    ANX 8765 are similar to those found in Silicon Image's chips. *Id.* (citing Shamilov Reply Decl. Ex.

3    B (Wiley Depo.) at 77-79). However, Griffin cites to pages of the Wiley Deposition that were not

4    provided to the Court.

5        ANX 8750, ANX 8755 and ANX8770: Griffin provided the register specifications for these

6    chips as exhibits to his original declaration. Griffin Decl. Ex. E (register specification for ANX

7    8750/8755), Ex. F (register specification for ANX8770/8775). He also provided parts of the

8    datasheet for the ANX8750/8755. *Id.* Ex. M. He compared these chips with the SiI9135 and

9    concluded that the Analogix chips "mimic registers" in the Silicon Image chip. Griffin Decl. ¶ 25.

10   He offers examples of this in attached exhibits N and O, which show that certain design features of

11   Silicon Image chips, e.g., the location of reserved bits, are also found in the Analogix chips. *Id.* Exs.

12   N & O. Griffin notes that the copying is not as blatant as that of some of the other Analogix chips

13   because some of the registers have been rearranged, but he finds sufficient residual design decisions

14   in the Analogix chips to deduce that there has been copying. *Id.* ¶ 25. This evidence is sufficient to

15   support a finding that these chips were copied from Silicon Image chips.

16       Based on the foregoing, the Court concludes that Silicon Image has demonstrated a strong

17   probability of success on the question of misappropriation as to all of the chips listed in its proposed

18   order except the ANX7660, ANX8760, and ANX8765.

19           **2.    Whether the Information is Subject to Trade Secret Protection**

20       Silicon Image asserts that the register designs for its chips, as well as all documentation that

21   describes the internal registers of its chips, including the programmer's reference guides, are trade

22   secrets that give it a competitive advantage in the field of HDMI chips. *See* Langley Decl. ¶¶ 3-7.

23   Analogix does not dispute that to the extent Silicon Image is able to maintain the secrecy of its

24   register designs, it is able to charge higher prices than would otherwise be possible. Indeed,

25   Analogix complains about Silicon Image's ability to charge higher prices for new versions of its

26   HDMI during the six months following initial release, when Silicon Image is privy to "exclusive,

27   pre-release information." Yang Decl. ¶ 6. Rather, Analogix asserts that some of the register designs

28   at issue in this case are not trade secrets because they already entered the public domain when they

1  were made available on the Internet website programsalon.com.  Further, Analogix argues, Silicon

2  Image has not taken reasonable measures to protect its alleged trade secrets because its non-

3  disclosure agreements expire after only two to four years and because Silicon Image has acquiesced

4  in an industry-wide practice according to which datasheets and other documentation containing chip

5  design information are freely exchanged.  Finally, Analogix asserts, Silicon Image should be denied

6  equitable relief on the basis of unclean hands because it has engaged in similar conduct to that of

7  which Analogix is accused, █████████████████████████████████

8  ████████████████████

9          **a.**    **Availability of Silicon Image's Trade Secrets on the Internet**

10        In order to be considered a trade secret under UTSA, information must be "valuable because

11  it is unknown to others."  *DVD Copy Control Ass'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 251

12  (2004).  This means that "information 'must be secret and must not be of public knowledge or of a

13  general knowledge in the trade or business.'"  *Id.* (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416

14  U.S. 470, 475 (1974)).  "Widespread, anonymous publication of the information over the Internet

15  may destroy its status as a trade secret."  *Id.*  On the other hand, publication on the Internet may not

16  destroy the secret if it is "sufficiently obscure or transient or otherwise limited so that it does not

17  become generally known to the relevant people, i.e., potential competitors or other persons to whom

18  the information would have some economic value."  *Id.*  The guiding concern in determining the

19  implications of Internet publication of information is whether "the information has retained its value

20  to the creator in spite of the publication."  *Id.*

21        Here, Analogix has pointed to postings of Silicon Image confidential information, some of

22  which was uploaded on June 15, 2006, and some of which was uploaded on December 23, 2006, on

23  a Chinese-language website, arguing that these postings destroyed the secrets at issue in this case.

24  As a preliminary matter, there is a serious question as to whether the information that was published

25  on this website actually revealed enough information about  the register maps at issue to be useful to

26  competitors.  *See* Griffin Reply Decl. ¶¶ 5-18.  Assuming that it did, however, there is no evidence,

27  that these postings were "generally known to the relevant people."  Even Analogix, whose business

28  was focused, in large part, on producing HDMI chips that were drop-in-replaceable with Silicon

1  Image's chips, was unaware of the information that was posted on the programsalon.com website,

2  according to Analogix CEO Yang. *See* Shamilov Reply Decl. Ex. J (Yang Depo.) at 179. Nor is

3  there any evidence in the record that any other competitor was aware of or able to use the source

4  code that was posted, or that the postings affected the value of the information to Silicon Image. To

5  the contrary, the evidence reflects that during the very period that Silicon Image's source code was

6  available on programsalon.com, Analogix was willing to pay large bonus's to obtain Silicon Image's

7  confidential information. *See* Shamilov Reply Decl. Exs. A, C, E, F, & G.

8        Based on the evidence in the record, the Court concludes that the source code published on

9  programsalon.com does not destroy the secrecy of the information at issue in this case.

10           **b.**     **Protective Measures and Silicon Image's NDAs**

11       Under California law, information qualifies as a trade secret only where reasonable efforts

12 have been made to protect its secrecy. Cal. Civ. Code § 3426.1(d)(2). "Reasonable efforts to

13 maintain secrecy have been held to include advising employees of the existence of a trade secret,

14 limiting access to a trade secret on 'need to know basis,' and controlling plant access." *Courtesy*

15 *Temp. Servs., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (quoting Cal. Civ. Code

16 § 3426.1 Legislative Comments – Senate; 1984 Addition).

17       The Legislative Committee Comment notes that "[c]ourts do not require that extreme and

18 unduly expensive procedures be taken to protect trade secrets against flagrant industrial espionage."

19 Cal. Civ. Code § 3426.1 Legislative Comments – Senate; 1984 Addition. On the other hand, courts

20 have denied trade secret protection where allegedly confidential information has been revealed to

21 third parties without protections that are considered adequate, for example, where the information

22 was disclosed under a non-disclosure agreement with only a limited duration. *See DB Riley, Inc. v.*

23 *AB Eng'g Corp.*, 977 F. Supp. 84, 91 (D. Mass. 1997) (holding that a parts manufacturer had not

24 taken reasonable steps to protect its design drawings – which therefore did not constitute trade

25 secrets – because it had provided the drawings to a customer under an agreement requiring that the

26 designs be kept confidential only for ten years after the expiration of the agreement); *ECT Int'l, Inc.*

27 *v. Zwerlein*, 228 Wis.2d 343, 355-56 (1999) (holding that where a confidentiality agreement with an

28

1  employee specified that trade secrets were to be kept confidential for one year after an employee's

2  employment terminated, reasonable efforts had not been made to protect confidentiality).

3       Silicon Image has presented evidence that it has in place procedures for protecting its trade

4  secrets: employees are required to sign confidentiality agreements, the facility is secure from

5  unauthorized access, the computer network is protected by a security system and access controls, and

6  confidential documents are labeled as such. *See* Langley Decl. ¶ 3. Further, Silicon Image provides

7  confidential information to customers only under non-disclosure agreements and after conducting

8  due diligence to ensure that the recipients are not competitors. *Id.* ¶¶ 4-7. This evidence, though, is

9  undermined by evidence that: 1) Silicon Image, as well as the customers and distributors to whom its

10  disclosed its confidential information, have sometimes disregarded and failed to respect

11  confidentiality designations and associated obligations imposed under NDAs,

12  ███████████████████████████████████████

13  ███████████████████████████████████████

14  ████████

15       With respect to the former category of evidence, the Court notes that

16  ████████████████████████████████████ there is also

17  evidence that customers provided Silicon Image with the confidential documents of competitors

18  (albeit unsolicited) as early as 2004. That evidence raises questions about whether Silicon Image's

19  reliance on NDAs to protect its own confidential information was reasonable at the time the alleged

20  copying occurred, in 2005 and 2006. The Court is also troubled by evidence that

21  ███████████████████████████████████████

22  ███████████████████████████████

23  ███████████████████████████████████

24  ███████████████████████████████████████

25  ███████████████████████████████████████

26  ███████████████████████████████████████

27  ███████████████████████████████████████

28  ███████████████████████████████████████

[redacted]

[redacted]

In light of this evidence, the Court cannot conclude that there is a high probability of success on Silicon Image's trade secret misappropriation claim against Analogix, despite the strong evidence presented by Silicon Image that its register information has been copied. Rather, the Court concludes that the evidences gives rise to serious questions on the merits as to this claim.

## C. Balance of the Hardships

Because the Court has concluded that Silicon Image has raised a serious question on the merits, it must determine whether the balance of the hardships tips "sharply" in its favor. The Court concludes that it has not.

Silicon Image argues that Analogix's sales of HDMI chips has contributed to general price erosion as the loss of goodwill as Silicon Image is perceived as a price "gouger." Silicon Image also presents evidence suggesting that there is a danger that Analogix will pass Silicon Image's trade secrets on to other competitors in the market and that [redacted]

[redacted] Analogix, in turn, asserts that Silicon Image's evidence regarding price erosion is conclusory and based on hearsay and, further, that its unreasonable delay in bringing this motion shows that there is no threat of immediate harm. Analogix also points to the disproportionate economic positions of Silicon Image and Analogix in the market: Silicon Image projects its 2007 total revenues will exceed $300 million, with continued "double-digit growth," *see* Simmons Decl. Ex. 7 (SIMG -Q2 2007 Silicon Image Earnings Conference Call) at 1, 5, while Analogix's yearly revenue is roughly $5 million. Yang Decl. ¶ 17.

[redacted]

[redacted]

Weighing this evidence, the Court cannot conclude that the balance of the hardships of denying injunctive relief tips sharply in Silicon Image's favor. First, as to the 1.2 version chips, Silicon Image conceded at oral argument that it had not sought injunctive relief in the summer of 2006, when it obtained detailed register maps indicating that Analogix was copying the Silicon Image chips, because those chips were already on the "downhill slide" of their career. Second, as to

the 1.3 version chips, the Court concludes the hardship to Silicon Image does not outweigh the likely

prejudice to Analogix — ███████████████████████████ However, in light of

the evident copying, the serious questions raised by Silicon Image on the merits, and the possibility

of irreparable harm, it is appropriate to conduct the trial in this matter as soon as possible.

Accordingly, the Court amends the existing schedule as follows:

Trial: **April 21, 2008** (for six (6) court days), at **8:30 a.m.**[3]

Pretrial Conference: **April 4, 2008, at 1:30 p.m.**

Close of expert discovery: **March 3, 2008**

Last day to serve expert disclosures under rule 26 with respect to issues on which a party does

not bear the burden of proof, and to serve rebuttal/opposition reports: **February 11, 2008**

Last day to serve expert disclosures under Rule 26 with respect to issues on which a party

bears the burden of proof: **January 25, 2008**

**IV. CONCLUSION**

For the reasons stated above, the Motion is DENIED.

IT IS SO ORDERED

Dated: December 20, 2007

JOSEPH C. SPERO
United States Magistrate Judge

---

[3] At oral argument, the Court raised the possibility of advancing the trial to April, without summary judgment motions. The parties did not object to the Court's proposal, and in its post-hearing brief, Silicon Image expressly requested such a schedule. If any party desires to file a summary judgment motion, it must first seek the Court's permission.